AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Candy Renner | ) | Mag. No. 21-mj-2031 (AMD) |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   December 2020 through February 2021   in the county of   Salem and elsewhere   in the

_____ District of   New Jersey   , the defendant(s) violated:

| Code Section | Description of Offenses |
|---|---|
| 21 U.S.C. § 846 | See Attachment A. |

This criminal complaint is based on these facts:

See Attachment B.

☑ Continued on the attached sheet.

_SA Nicholas Singer_
*Complainant's signature*

Nicholas Singer, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____   *(specify reliable electronic means)*.

Date:   03/10/2021

*Judge's signature*

City and state:   District of New Jersey   Hon. Ann Marie Donio, U.S. Magistrate Judge
*Printed name and title*

CONTENTS APPROVED

UNITED STATES ATTORNEY


By: */s/Jeffrey B. Bender*
Jeffrey B. Bender, Assistant U.S. Attorney

Date: March 10, 2021

## ATTACHMENT A

## COUNT ONE

(Conspiracy to Distribute Controlled Substances)

Between in or about December 2020 and in or about February 2021, in the District of New Jersey and elsewhere, the defendant,

**CANDY RENNER**,

knowingly and intentionally conspired and agreed with others, known and unknown, to distribute and possess with intent to distribute at least 50 grams of methamphetamine, its salts, isomers, and salts of its isomers, and at least 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), and at least 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(l) and (b)(1)(B).

In violation of Title 21, United States Code, Section 846.

**ATTACHMENT B**
**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS**

## I.      INTRODUCTION

I, Nicholas Singer, a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice, being duly sworn, state as follows:

1.      I am a Special Agent with the DEA and have been employed as a Special Agent with the DEA since August of 2008.  I am currently assigned to the Camden Resident Office of the DEA's New Jersey Division, where I conduct investigations relating to, among other offenses, narcotics violations.  I have been trained in various aspects of law enforcement, particularly the investigation of narcotics offenses.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics and the organization of drug conspiracies.  During my employment with the DEA, I have been involved in multiple narcotics investigations.  In the course of those investigations and others, I have conducted physical surveillance, interviewed cooperating witnesses, conducted and managed the controlled purchases of narcotics by undercover officers and informants, oversaw the consensual recordings of communications, analyzed telephone toll records and records relating to narcotics trafficking and money laundering, participated in the execution of search warrants (including the search of cellular telephones ("cell phones") and other electronic media), and secured other relevant information using various investigative techniques, including electronic surveillance.  I have also debriefed and supervised the activities of numerous confidential sources who have provided information and assisted in the federal and state prosecution of drug and violent crime offenders.  I have previously served as the affiant for affidavits used in support of applications for state and federal Title III interceptions, and I have led the investigations that utilized those Title III interceptions.

2.      Based on my training and experience, I am familiar with the methods of drug organizations

and their operations, the terminology used by members of these organizations, and the measures they

employ to distribute controlled substances and exert influence and control within the marketplace for illicit

drugs.  I am familiar with the means and methods used by drug traffickers to smuggle, import, and

distribute controlled substances, and to conceal and launder of proceeds from the unlawful sale of

controlled substances.  I am aware that individuals involved in the illicit distribution of controlled

substances routinely attempt to conceal their identities and the locations at which they conduct drug

transactions.  I also am familiar with the investigative techniques and practices utilized by law enforcement

to investigate and dismantle drug distribution organizations.  I have also worked closely with other agents

and task force officers who have experience and expertise in wire and electronic interception.  My

training and my experience working with other agents and task force officers has provided me familiarity

with the Title III investigative technique and the laws and rules that govern that technique.

3.      Based on my training and experience, I know that the success of drug trafficking

organizations ("DTOs") depends upon maintaining extensive contacts with their co-conspirators.  I am

aware that drug traffickers commonly use cellular telephones, including voicemail, push-to-talk ("PTT"),

and text messages, in furtherance of their drug trafficking activities and to maintain contact with their

suppliers, couriers, customers, and others involved in the unlawful transportation, storage, distribution,

and marketing of controlled substances.  It is essential that DTO members maintain contact with one

another and utilize expedient means of communication.  To do this, constant access to telephone

communication, including cellular access, push-to-talk, and access to the internet to communicate through

social media such as Facebook, Twitter, Instagram, and text messaging, among other mediums, is

necessary.  The use of telephonic and other electronic communication is essential in maintaining timely

long distance and local contacts with the original suppliers and those down the organizational chain,

including local dealers.  I am aware that those involved in illegal drug operations often subscribe to their

telephones and cellular telephones in the names of others or purchase pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase and utilize the phone, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement. Additionally, based on my training and experience, I am aware that members of DTOs often use multiple cellular telephones to conduct unlawful narcotics activity. Specifically, I know that one of the ways individuals involved in the illicit distribution of controlled substances conceal their activities in an attempt to thwart potential electronic surveillance by law enforcement is by using multiple cellular telephones and changing their cellular telephone numbers frequently. I am also aware that drug traffickers often speak in vague, guarded, or coded language in an attempt to conceal the illicit nature of their conversations. I am familiar with the terminology, "lingo," and code words used in the drug trafficking trade, especially among organizations that engage in street-level distribution.

4.      As one of the "case" or lead investigative agents, I have supervised this investigation and am thoroughly familiar with the information contained in this Affidavit, either through personal investigation or through information provided by other law enforcement officers who have obtained information that they, in turn, have reported to me. I also have reviewed available documents that are relevant to this investigation. I make this Affidavit based on personal knowledge derived from my participation in this investigation and on information I believe to be reliable and accurate from the following sources:

      a.  my training and experience investigating drug trafficking offenses and the training and experience of colleagues with whom I am working on this investigation;

      b.  oral and written reports, and documents relating to this investigation that I have obtained and received from agents of the DEA, other federal law enforcement agencies, and local law enforcement officers;

    c.    discussions I have had concerning this investigation with experienced narcotics investigators;

    d.    physical surveillance conducted by the DEA, other federal law enforcement agents, and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

    e.    public records;

    f.    telephone toll records, pen register and trap and trace data, and telephone subscriber information;

    g.    information obtained through execution of cellular telephone and tracking search warrants;

    h.    statements of confidential sources;

    i.    consensually monitored and recorded phone calls and text messages, including communications involving Target Telephone 1;

    j.    controlled purchases of methamphetamine by an undercover law enforcement officer, and covert audio and/or video recordings made in connection with these operations; and

    k.    the Court-authorized Title III interception of wire and electronic communications over Target Telephone 1, Target Telephone 2, and Target Telephone 3.

    5.      When describing conversations or text messages, unless otherwise noted, I have provided a summary of or excerpts from those communications. When providing transcriptions of conversations, either I or another monitoring agent has listened to the conversation and provided a substantially verbatim transcript of the it, accounting for the fact that the final transcripts of these conversations may contain minor edits for syntax or language, which would not bear on the overall substance or meaning of the

conversation, as I have reported and transcribed it herein.  At times, interpretations of certain coded words or cryptic or slang phrases are placed in parentheses or explained following the summaries, where deemed necessary, and where they can be interpreted based on agents' training and experience.

6.　　　Because this Affidavit is being submitted for the limited purpose of setting forth probable cause for the issuance of the requested complaints and arrest warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to support issuance of the requested complaints and arrest warrants.

## II.　　　SUMMARY

A.　　　BACKGROUND OF INVESTIGATION

7.　　　In or about the month of July 2020, I and other law enforcement investigators initiated the instant investigation into the unlawful drug distribution activities of an organization (herein, "Bless DTO"), which operates throughout southern New Jersey and in and around Philadelphia, Pennsylvania. Through various investigative measures, including those described throughout this Affidavit, I and other members of the investigative team have determined that the Bless DTO distributes controlled substances, including crystal methamphetamine and heroin, throughout the greater Philadelphia area and southern New Jersey.

8.　　　As set forth in greater detail below, investigators have determined that the DTO members are actively engaged in a drug distribution conspiracy.  In making this determination, investigators have used techniques including, but not limited to, interviews of confidential human sources, consensual recordings of meetings and conversations, controlled drug purchases of crystal methamphetamine by an undercover officer from Bless DTO member SUMMER BRUNNER ("BRUNNER"), toll and phone record analyses, deployment of GPS vehicle tracking devices on BRUNNER's cars, use of pen register/trap and trace devices, physical and video surveillance, and Title III interceptions and recordings of wire and electronic communications as described herein.

5

9.      The crystal methamphetamine sold by BRUNNER to an undercover officer over the course of the investigation was later tested by a DEA laboratory, which confirmed that the substance was 99% (+/- 6%) pure methamphetamine hydrochloride.  Similarly, the crystal methamphetamine recovered during a January 12, 2021 car stop of WILLIAM RENNER and CANDY RENNER was later tested by a DEA laboratory, which confirmed that the substance was 27.2 grams (+/- 0.2 grams) of 98% (+/- 6%) pure methamphetamine hydrochloride.  The crystal methamphetamine recovered from a Bless DTO associate during a December 2, 2020 encounter with local law enforcement was later tested by a DEA laboratory, which confirmed that the substance was 33.312 grams (+/- 0.003 grams) of 95% (+/- 6%) pure methamphetamine hydrochloride.  Laboratory testing of the other suspected crystal methamphetamine recovered during the investigation is pending.

10.     Many of the seized drugs and drug deals described in this Affidavit involve crystal methamphetamine, including the BRUNNER drug deals (typically 2 to 4 ounces of crystal methamphetamine during each of the numerous drug deals); as well as a series of arrests of Bless DTO associates on various dates from early December 2020 through mid-February 2021, each of which resulted in seizures of crystal methamphetamine in amounts ranging from approximately 1 ounce to approximately 5 ounces per seizure.  I therefore believe that the Bless DTO conspired to distribute at least 50 grams of methamphetamine and at least 500 grams of substances containing methamphetamine.

11.     I also believe that the Bless DTO conspired to distribute at least 100 grams or more of a mixture or substance containing a detectable amount of heroin.  My belief is based on drug deals involving Bless DTO members distributing what I believe are "bundles" or "boxes" of heroin.  Based on my training, experience, and knowledge of common practices of DTOs in the greater Philadelphia and southern New Jersey area, a bundle typically contains between approximately 0.5 and 1 gram of heroin.  Based on the frequency and consistency with which apparent heroin customer BUYER 1 and others have obtained

6

heroin from the Bless DTO, and the length of time the Bless DTO has been distributing heroin to these customers, I believe that the Bless DTO has conspired to distribute at least 100 grams of heroin. For example, during a six-week period spanning January 12, 2021 through February 22, 2021, intercepted communications reflect DTO members and customers arranging sales of at least 63 items (*e.g.*, "one whole," "two Bs," etc.). Based on my knowledge of the investigation, the terminology used, the locations of these sales, and the participants in these sales, I believe that these items were heroin. I believe 50 grams is a conservative estimate of the amount of heroin in these 63 items. Therefore, taking into account the numerous additional sales that occurred outside this six-week time period, I believe that the Bless DTO has conspired to distribute at least 100 grams of heroin.

12.     Through the investigation, investigators have developed information regarding the inner workings of the Bless DTO and its leader, who law enforcement has not yet identified but goes by, among other aliases, "BLESS." BLESS works in concert with and directs co-conspirators (*i.e.*, runners) to distribute crystal methamphetamine and other drugs to other members of the Bless DTO. In general, it appears that when a member of the Bless DTO wants to obtain drugs from BLESS, that individual contacts BLESS over Target Telephone 2 or Target Telephone 3, both of which are described in more detail below. BLESS uses the same telephone to dispatch a runner to meet with and provide drugs to the individual. To arrange the logistics of the meeting and/or to facilitate the parties actually locating each other for the meeting, BLESS frequently coordinates three-way telephone calls between himself, the runner, and the person seeking to obtain drugs from BLESS via the runner.

B.     AUTHORIZED INTERCEPTIONS OF WIRE AND ELECTRONIC COMMUNICATIONS

13.     During the course of the investigation, law enforcement agents obtained authorization to intercept wire and electronic communications over three cellular telephones:  the cellular telephone bearing number (856) XXX-5047 and International Mobile Subscriber Identity ("IMSI") number XXXXXXXXXXX2938 belonging to SUMMER BRUNNER ("Target Telephone 1"); the cellular

telephone bearing number (484) XXX-9404 and IMSI number XXXXXXXXXX5462, with no listed subscriber but activated and used by BLESS ("Target Telephone 2"); and the cellular telephone bearing number (484) XXX-8785 and IMSI number XXXXXXXXXX5906, with no listed subscriber but activated and used by BLESS ("Target Telephone 3").

### III.    PROBABLE CAUSE TO ARREST AND CHARGE DTO MEMBERS

14.    During the course of the investigation, law enforcement has used various investigative means and techniques in an effort to disrupt and dismantle the DTO to include: consensual audio recordings, controlled drug purchases, pen registers, search warrants, video surveillance, interviews of potential sources, and Title III interception of wire and electronic communications.  Information gathered from these investigative techniques has established probable cause to arrest the individuals set forth as follows.

### SUMMER BRUNNER A/K/A SUMMER PENN

15.    During the course of the investigation, SUMMER BRUNNER a/k/a "Summer Penn" (hereinafter, "BRUNNER") has obtained drugs from other members of the Bless DTO for further distribution of multiple occasions.   BRUNNER has met with BLESS runners to obtain crystal methamphetamine, and at times other drugs, for further distribution on numerous occasions, including on January 12, 2021.  During the investigation, BRUNNER has used Target Telephone 1 to arrange the distribution of drugs to and from other members of the Bless DTO.

### WILLIAM RENNER and CANDY RENNER

16.    WILLIAM RENNER and CANDY RENNER work in concert with BRUNNER to distribute crystal methamphetamine obtained from other members of the Bless DTO.

**December 19, 2020 Communications Between BRUNNER and CANDY RENNER:**

17.     On December 19, 2020 at 9:53 p.m., law enforcement agents intercepted the following message from (856) XXX-4640, used by CANDY RENNER, to Target Telephone 1, used by BRUNNER:

8

"Got people waiting girl...whats ip wit cha...."

18.     On December 19, 2020 at 9:54 p.m., law enforcement agents intercepted an outgoing call from Target Telephone 1, used by BRUNNER, to Target Telephone 2, used by BLESS, in which BRUNNER arranged to obtain "2."  Then a few minutes later, at 9:59 p.m., Target Telephone 1, used by BRUNNER sent Target Telephone 2, used by BLESS, the following message: "I'm ready for an ETA whenever u have that...thanks again so much😋."

19.     On December 19, 2020 at 9:59 p.m., law enforcement agents intercepted an outgoing call from Target Telephone 1, used by BRUNNER, to CANDY RENNER, excerpted as follows:

```
C. RENNER:  Hello.
BRUNNER:    Hey.
C. RENNER:  Hey.
BRUNNER:    So everything is um.. in the transit then... so I am... um.. busting a move
            and I will be there.
C. RENNER:  Okay.
BRUNNER:    Umm.. do you need me to skate buy or anything?
C. RENNER:  No, no, no is not dry...
[Voices overlap]
BRUNNER:    Okay.
C. RENNER:  Just what people are waiting to leave... so
[Voices overlap]
BRUNNER:    Got ya.
C. RENNER:  So what's your ETA?
BRUNNER:    Um.. I'm waiting on that right now... and then is just a quick swoop boom.
C. RENNER:  Yeah, you don't know how long though?
BRUNNER:    Umm.. I'm their sending it right now, theeir... it's in tran-- Um
C. RENNER:  Okay, that's what I'll say.
BRUNNER:    Yeah... yep... is cool?
C. RENNER:  Alright. [sighs]
BRUNNER:    Alright so I'm guessing within the hour.
C. RENNER:  Alright, we'll talk.
[Voices overlap]
BRUNNER:    Okay. Yup.
C. RENNER:  Bye.
BRUNNER:    Bye.
```

20.     Based on my training, experience, and knowledge of the investigation, I believe that CANDY RENNER messaged BRUNNER to indicate that CANDY RENNER was with people who were

ready to obtain drugs, which CANDY RENNER needed to obtain from BRUNNER ("Got people waiting girl...whats ip wit cha...."). Immediately after this message, BRUNNER contacted BLESS to arrange a meeting to obtain drugs. After BRUNNER messaged BLESS indicating she was ready to meet ("I'm ready for an ETA whenever u have that"), BRUNNER called CANDY RENNER. During this phone call, CANDY RENNER declined BRUNNER's offer to come before BRUNNER obtained more drugs from BLESS because CANDY RENNER was not out of drugs yet ("do you need me to skate buy or anything?" and "No, no, no is not dry..."). BRUNNER indicated she was waiting to obtain an "ETA" but indicated it would be "quick" because the drugs were "in trans[it]" so would likely be "within the hour."

**December 26, 2020 Communications Between BRUNNER and WILLIAM RENNER:**

      21.     On December 26, 2020, at 1:44 p.m., law enforcement agents intercepted an incoming call to Target Telephone 1, used by BRUNNER, from (856) XXX-4965, used by WILLIAM RENNER. The following is an excerpt of this incoming call to BRUNNER:

| | |
|---|---|
| BRUNNER: | Hello. |
| W. RENNER: | Hey are you home? |
| BRUNNER: | Yeah I'm home, well I'm at my apartment. |
| W. RENNER: | Okay. |
| BRUNNER: | Are you [U/I]. |
| W. RENNER: | I have a posse with me. |
| BRUNNER: | What's up? |
| W. RENNER: | Some heavy hitters. |
| BRUNNER: | Oh shit. |
| W. RENNER: | Some Rough Riders. |
| BRUNNER: | Woah. You guys heading over? |
| W. RENNER: | [Chuckles] What was that? Yeah, yeah. |
| BRUNNER: | Okay. |

      22.     Based on my training, experience, and knowledge of the investigation, I believe that WILLIAM RENNER contacted BRUNNER to obtain drugs for further distribution. My belief is based, in part, on BRUNNER using Target Telephone 1 to send the following text to Bless on Target Telephone 2 at 1:46 p.m., immediately after her call with WILLIAM RENNER concluded: "I'm not trying to be a

10

Case 1:21-mj-02031-AMD   Document 1   Filed 03/10/21   Page 14 of 17 PageID: 14

pain in the butt ..but..I'm on E..n they are coming in hard.." I believe this text shows that BRUNNER

needed to obtain additional drugs to provide to RENNER because "I'm on E" means that she was out of

drugs and the requests for drugs (specifically from RENNER) were "coming in hard." Subsequent

intercepted communications and surveillance reflect that BRUNNER obtained additional drugs from a

BLESS runner around 7:00 p.m. and sought to meet WILLIAM RENNER afterwards. Specifically, on

December 26, 2020 at 7:16 p.m., BRUNNER used Target Telephone 1 to message WILLIAM RENNER:

"Can u meet me 745 at my apartment please[.]"

**January 12, 2021 Drug Deal with BRUNNER and Arrest of WILLIAM and CANDY RENNER:**

23.    On January 12, 2021 between 1:48 p.m. and 1:54 p.m., law enforcement agents intercepted

the following messages between BRUNNER over Target Telephone 1 and BLESS over Target Telephone

3:

| BRUNNER: | Heyyy |
|---|---|
| BLESS: | Hey hey |
| BRUNNER: | Anyone avail to come my way |
| BRUNNER: | [name of casino] again? |
| BLESS: | Yup |
| BLESS: | What time and how many |
| BRUNNER: | Do u have that fire? I would like 2 plus that shortage feom the other day? |
| BRUNNER: | Letme check i may do 4..can u please give me a few min |
| BRUNNER: | 4 |
| BLESS: | Okay I gotchu |
| BRUNNER: | Yep..215 work for ya |
| BLESS: | 2:15 |
| BLESS: | It's no way ur getting there that fast |
| BRUNNER: | Lol |
| BRUNNER: | Meant 315 |

24.    I believe based on my training, experience, and knowledge of the investigation that

BRUNNER sought to obtain four ounces of crystal methamphetamine from a BLESS runner at a Delaware

casino at 3:15 p.m. the same afternoon.

25.    Shortly after BRUNNER and BLESS arranged their drug deal, on January 12, 2021 at 2:01

11

p.m., law enforcement agents intercepted an outgoing call from BRUNNER over Target Telephone 1 to WILLIAM RENNER.  Based on the intercepted conversation, I believe that BRUNNER and WILLIAM RENNER agreed to meet at a casino in Delaware after BRUNNER obtained drugs from BLESS's runner so that BRUNNER could provide a portion of the drugs to the RENNERs.

26.     On January 12, 2021 at 3:13 p.m., law enforcement agents intercepted what appears to be a three-way call between BRUNNER over Target Telephone 1, BLESS over Target Telephone 3, and an unknown Bless runner in which BRUNNER indicated that she was at the casino in her Blazer and the runner indicated he was arriving in "one minute."  Consistent with the intercepted communications, at approximately 3:13 p.m., law enforcement agents observed a white Nissan Maxima and BRUNNER's black Chevrolet Blazer both approach the casino.  On a road near the casino, BRUNNER's car parked behind the Maxima.  BRUNNER got out of her car, walked over to the Maxima, and leaned into the rear passenger side.  I believe that BRUNNER obtained drugs from the runner when she leaned into the Maxima.  Moments later, BRUNNER returned to her car and continued driving toward the casino.  The Nissan Maxima made a U-turn and left the area.

27.     On January 12, 2021 at 3:29 p.m., law enforcement agents intercepted an outgoing call from BRUNNER over Target Telephone 1 to WILLIAM RENNER in which BRUNNER told WILLIAM RENNER that she saw him and directed him to where she was standing in the vicinity of the casino.  At approximately the same time, law enforcement agents observed entering the casino parking lot a white four door Ford F-150 pickup truck fitting the description of the vehicle WILLIAM RENNER is known to operate.  Moments later, law enforcement agents saw the Ford F-150 believed to be WILLIAM RENNER'S truck leave the parking lot and depart the area.

28.     At approximately 4:05 p.m., local law enforcement officers conducted a traffic stop of the Ford F-150 driven by WILLIAM RENNER.  CANDY RENNER was a passenger in the Ford F-150.  As

officers were about to have a K-9 walk around the car, WILLIAM RENNER told officers that they would find "meth" in CANDY RENNER's purse on the passenger-side floor.  WILLIAM RENNER consented to a search of the Ford F-150, after which officers recovered from CANDY RENNER's purse a clear plastic bag containing a white substance suspected to be crystal methamphetamine.  As described above, later testing by a DEA laboratory confirmed the substance was 27.2 grams of 98% pure methamphetamine hydrochloride.

## IV.     SEALING

29.     Because this application and Affidavit pertain to an ongoing criminal investigation, and because disclosure of the information contained herein as well a disclosure of the complaints and warrants being requested may compromise the investigation and increase the risk of harm for law enforcement officers who are responsible for conducting the arrests, I request that this Affidavit, the criminal complaints, the arrest warrants, and all related documents be filed under seal until further order of the Court, except for a copy of the arrest warrants to be served at the time of execution.

## V.     CONCLUSION

30.     Wherefore, I submit that there is probable cause to believe that the members of the conspiracy described above, from at least in or about December 2020 to in or about February 2021, in the District of New Jersey and elsewhere, did knowingly and intentionally conspire and agree with each other and with others, known and unknown, to distribute and possess with intent to distribute at least 50 grams of methamphetamine, its salts, isomers, and salts of its isomers, and at least 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), and at least 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(l) and (b)(1)(B), in violation of Title 21, United  States Code, Section 846.

31.     The information contained in this Affidavit is known to be true and correct to the

best of my knowledge, information and belief.

Respectfully submitted,

*SA Nicholas Singer*

Nicholas Singer
DEA Special Agent


Pursuant to Fed. R. Crim. P. 4.1, DEA Special Agent Singer was sworn and attested to the contents of this affidavit in support of the criminal complaint.

_____          Date: March 10, 2021

HON. ANN MARIE DONIO
United States Magistrate Judge

14